**UNITED STATES of America**
**v.**
**Stuart COHEN et al., Defendants.**
**Nos. 72 Cr. 715, 72 Cr. 778.**

United States District Court,
S. D. New York.
April 25, 1973.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., for the United States; Henry Putzel III, Joseph Jaffe, Asst. U. S. Attys., of counsel.

Barry Ivan Slotnick, Martin Elefant, Brooklyn, N. Y., for defendant Stuart Cohen.

Bertram Zweibon, Robert Persky, New York City, for defendant Sheldon Davis.

Alan M. Dershowitz, Cambridge, Mass., Norman Zalkind, Harvey Silverglate, Zalkind & Silverglate, Boston, Mass., for defendant Sheldon Seigel.

## OPINION

BAUMAN, District Judge.

On February 2, 1973, three days before the trial in the above entitled action

was due to commence, the government disclosed in open court that Sheldon Seigel, one of the defendants, had provided the government with the information that led to the instant indictment, and had testified before the grand jury. The government further announced its intention of calling Seigel as a witness, under a grant of immunity, at the trial. The government's motion to sever Seigel's trial from that of the defendants Cohen and Davis was thereupon granted.

This disclosure, of which the remaining defendants had been apprised on January 26, 1973, has resulted in the multiplicity of motions which are now before this court. The defendants Cohen and Davis moved to dismiss the indictment on the ground that the presence of a government agent in the defense camp constituted a violation of their right to counsel secured by the Sixth Amendment. Seigel's motion is both more novel and more complex. He seeks an order preventing the government from calling him as a witness at the trial of Cohen and Davis or, at the very least, preventing the government from asking him any questions based on evidence obtained in violation of his constitutional rights. Seigel adduces four separate but interrelated arguments in support of this motion: a) all disclosures made by Seigel to the government derive from illegal wiretaps of Seigel's telephone conversations both at Jewish Defense League headquarters and at his home; b) all such disclosures also derive from an illegal search of Seigel's automobile on June 4, 1971; c) Seigel was promised by government representatives that if he furnished the information that forms the basis of this indictment, he would not be called as a witness at the trial, and the government must now be held to this promise; d) the information elicited from Seigel was obtained in violation of his Sixth Amendment right to counsel. An evidentiary hearing was held by this court over a period of two weeks during which various other motions, ancillary to those already set forth, were made and they shall also be treated below.

A brief exposition of the history of Seigel's involvement with the government and of the origins of the instant prosecution will be helpful in giving context to the parties' legal arguments. Although there are sharp factual disputes, the brief ensuing narrative will refer only to those facts which are undisputed.

On June 4, 1971 Seigel was arrested along with Israel Danziger at the Meyers Brothers parking garage at 149 West 49th Street in Manhattan by Detective Jeremiah Howard of the New York City Police Department. His car was searched and was found to contain, inter alia, fragments of wire, several pieces of plastic, a can of mace, a small film capsule filled with gunpowder, a cylindrical cardboard tube containing a fuse, and ten empty alarm clock boxes. Seigel was subsequently taken to the 18th Precinct station house, booked, and released. His car was impounded.[1]

Seigel repeatedly tried to obtain the return of his car, without success. During these efforts he came in contact with a number of law enforcement officials, among whom were: Melvin Glass, then an Assistant District Attorney for New York County, now a judge of the New York City Criminal Court; Thomas Pattison, an Assistant United States Attorney for the Eastern District of New York; Michael LaPerch of the Alcohol and Firearms Division of the U. S. Treasury Department; and Detectives Santo Parola and Joseph Gibney of the New York City Police Department. All of these men, especially Parola, who was to develop a close and continuing relationship with Seigel, attempted to induce him to cooperate with various law enforcement authorities in their investigation of the activities of the Jewish Defense League, particularly with reference to the bombing of the offices of the

---

1. On June 29, 1971, Seigel was formally indicted for possession of explosives. The People v. Seigel, No. 3367/71 (Sup.Ct., New York County).

Amtorg Trading Corporation on April 22, 1971.

Early that August, Parola succeeded in returning Seigel's car and shortly thereafter (on August 9, by Parola's recollection) Seigel admitted his participation in the Amtorg bombing and agreed to cooperate with the ongoing investigation. On September 8, 1971, Seigel testified before a federal grand jury in the Eastern District of New York and what may be called the Amtorg indictment was returned that same day.[2] One day later Seigel was arrested along with the other defendants in the case, in order to conceal his cooperation with the government. He continued to meet frequently with Parola and Gibney, who attempted to mine whatever other nuggets Seigel might have about other J.D.L. activities.[3]

On January 26, 1972, the offices of Hurok Artists, Inc., and Columbia Artists Management, Inc., were bombed. Parola apparently did not suspect Seigel's participation in this bombing, and Seigel did not disclose his role to Parola until May 7, 1972. On June 16, 1972, Seigel testified before the grand jury of this court which returned the so-called Hurok indictment. Until late October, no one outside the government knew of Seigel's double role; it was only then that his attorney discovered his client had been an informer.

■ Seigel now seeks to prevent the government from calling him as a witness at the trial of defendants Cohen and Davis, even under a grant of immunity. He argues that any conceivable question that could be put to him at trial would be based on information se-

cured in violation of his constitutional rights. See United States v. Calandra, 465 F.2d 1218 (6th Cir. 1972), cert. granted, 410 U.S. 925, 93 S.Ct. 1357, 35 L.Ed.2d 585 (1973). In *Calandra* the Sixth Circuit held that a grand jury witness, for whom the government had requested immunity, had standing to move to suppress evidence obtained in violation of rights secured to him by the Fourth Amendment. I accept that holding and conclude that Seigel may challenge all of the alleged violations of his constitutional rights. To rule otherwise would permit the government, when it has obtained evidence illegally, to confer immunity on a defendant and then circumvent the effect of the exclusionary rule by prosecuting him for contempt.[4]

■ Although Seigel has not yet been called as a witness, and not yet granted immunity, I have concluded that his claims can be considered most efficiently at this juncture. The situation here is the same as faced the district court in *Calandra*. I find its view compelling:

"It is the position of the Government that this motion is premature because it is being considered prior to the grant of immunity rather than in connection with a contempt hearing. This Court cannot agree. It has been stipulated that the Government intends to immunize Calandra and that Calandra intends not to answer its questions even at the risk of a contempt citation. Thus in substance, the situation is in the same posture as it would be in connection with a contempt hearing. The scope of review is no larger here than it would be after Calandra had gone through the re-

---

2. United States v. Schwartz, Beiber, Cohen, Seigel, Garfinkle, and Weisel, 71 Cr. 975, 977 (E.D.N.Y.).

3. During several of Seigel's meetings with Parola and other government officials, Seigel recorded the conversations. Tapes of five such conversations were offered in evidence by the defense during the hearing. Three of the tapes record conversations taking place in the fall of 1971. A fourth records a conversation be-

tween Seigel, his wife, Parola, and Gibney on February 1, 1973. Another tape consists of telephone conversations between Seigel and Parola, taped in late October, 1971.

4. It is also worth noting that many of the arguments advanced by the government in *Calandra* against conferring such standing on *grand jury* witnesses are inapplicable here.

volving door which would bring him back here raising the same issues in a defense to a contempt citation." In re Calandra, 332 F.Supp. 737 (N.D.Ohio 1971).

Accordingly, I adopt its procedure.

The four activities which allegedly violated Seigel's constitutional rights have already been set forth; it is important to point out, moreover, that Seigel argues not only that each of those activities furnishes an independent basis for suppressing his testimony, but that they form an interlocking chain of causation which resulted in his furnishing information to the government. The causal linkage he perceives may be summarized as follows. The government first focused upon Seigel as a suspect in the Amtorg bombing because of conversations overheard on an unlawful wiretap installed at the J.D.L. headquarters early in 1971. This knowledge, gleaned through wiretaps, enabled the government immediately to identify Seigel as the purchaser of a quantity of wire and batteries at a Brooklyn store called the Radio Shack on June 3, 1971. Thus Seigel was placed under surveillance on June 4, 1971 and ultimately arrested at the Meyers Brothers garage on that same day. At the garage Seigel's car was subjected to an illegal search, the fruits of which have already been described. This arrest, in turn, placed Seigel at the mercies of various government officials who further violated his constitutional rights by eliciting information from him in the absence of counsel and who, indeed, actively discouraged Seigel from disclosing any of his meetings with these officials to his lawyer. In addition, the information was allegedly obtained from Seigel on the express understanding that he would never be required to testify, either in the *Amtorg* or *Hurok* cases. Thus Seigel argues that each link in the chain that led to his disclosures contains its own illegalities and is also tainted by the original illegality of the wiretap. I therefore propose to examine each "link" in turn.

## I. A

Seigel's first argument is that any questions which the government might put to him at trial would be based on information derived directly or indirectly from two concededly unlawful wiretaps: 1) a tap of the offices of the Jewish Defense League maintained from October, 1970 to July 2, 1971[5] and 2) a tap of Seigel's home telephone maintained from December 15, 1971 to March 1, 1972.

Seigel's standing to object to questions posed to him is confirmed by the recent decision of the Supreme Court in Gelbard v. United States, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). *Gelbard* held that a grand jury witness who refused to answer questions was entitled, in a contempt proceeding pursuant to 28 U.S.C. § 1826(a),[6] to invoke the prohibitions of 18 U.S.C. § 2515[7] as

---

5. The logs of this tap disclose six conversations involving Seigel, on the following dates: February 24, 1971; March 17, 1971; May 12, 1971; May 13, 1971; June 5, 1971; and June 9, 1971.

6. 28 U.S.C. § 1826(a) provides:
 "(a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the

witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of—
 (1) the court proceeding, or
 (2) the term of the grand jury, including extensions, before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months."

7. 18 U.S.C. § 2515 provides:
 "Wherever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, of-

"just cause" for refusal to answer such questions. This latter statute, a provision of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, states, in pertinent part, that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court . . . if the disclosure of that information would be in violation of this chapter." The Court reasoned that "to order a grand jury witness, on pain of imprisonment, to disclose evidence that § 2515 bars in unequivocal terms is both to thwart the congressional objective of protecting individual privacy by excluding such evidence and to entangle the courts in the illegal acts of Government agents." 408 U.S. at 51, 92 S.Ct. at 2363.

■■ *Gelbard's* significance lies in its holding that Title III may be invoked not only by a defendant in a criminal case to exclude evidence at trial, but also by a witness, even one who has been granted immunity.[8] A witness thus comes within the definition of "aggrieved person", 18 U.S.C. § 2518(10)(a), with standing to, in effect, suppress his own testimony even in a criminal proceeding against another person. Seigel is thus clearly entitled to the protection of *Gelbard* in the trial of Cohen and Davis.

The theory on which Seigel relies to substantiate his claim of wiretap taint is that enunciated in United States v. Tane, 329 F.2d 848 (2d Cir. 1964). Our

Court of Appeals held that where the identity of a witness was first discovered by the government from an unlawful wiretap, the entire proffered testimony of that witness must be suppressed. See also, Smith v. United States, 120 U.S.App.D.C. 160, 344 F.2d 545 (1965); United States v. Alston, 311 F.Supp. 296 (D.D.C.1970). Seigel urges that his identity as an active member of the J.D.L. was first revealed by the tap of J.D.L. headquarters in 1971; thus the government was put on the trail that ultimately led to the search of June 4, 1971 and thence to Seigel's cooperation. Seigel further contends that the taps of his home in 1971 and 1972 disclosed to the government his participation in the Hurok bombing. After a careful review of the testimony adduced at the hearing, I have concluded that the evidence supports neither of these contentions.

■■ Before reviewing the evidence, a word about burden of proof is indicated. The government's task here was to demonstrate, by a preponderance of the evidence, that Seigel's identity was not revealed by the illegal J.D.L. wiretaps and further, that its information about Seigel's role in the Hurok bombing did not derive from the wiretaps of Seigel's home. United States v. Cole, 463 F.2d 163 (2d Cir. 1972); United States v. Friedland, 441 F.2d 855 (2d Cir. 1971) cert. denied 404 U.S. 867, 92 S.Ct. 143, 30 L.Ed.2d 111 (1971); United States v. Schipani, 414 F.2d 1262 (2d Cir. 1969). See also Lego v. Twomey, 404 U.S. 477, 487–489, 92 S.Ct. 619, 30 L.Ed. 2d 618 (1972).[9]

---

ficer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

8. In the companion case to Gelbard, United States v. Egan et al., 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179, the respondents had been granted transactional immunity in return for their testimony. They appeared before the grand jury, but

refused to answer questions on the ground that such questions were based on information gleaned from illegal wiretaps.

9. Seigel's contention that the government must prove beyond a reasonable doubt that its evidence derives from sources independent of the wiretaps is erroneous. Not only is there no basis for this conclusion in Judge Weinstein's opinion in United States v. Schipani, 289 F.Supp. 43 (E.D.N.Y.1968); the Supreme Court's opinion in Lego v. Twomey, supra, con-

The evidence presented at the hearing established that the government's investigation came to focus on Seigel in the Amtorg case in the following manner. An unexploded bomb recovered in the Amtorg case made use of a Micronta timing device. The police determined that such devices were sold only by Radio Shack, Inc., a chain which has several stores in New York City. The police ultimately learned that two such timers had been purchased at a Radio Shack store at 13th Avenue in the Borough Park section of Brooklyn by one "Feldman" one day prior to the Amtorg bombing.[10]

On June 3, 1971 Detective Parola received a telephone call from the manager of that store who stated that the person who had purchased the timers had just purchased a substantial quantity of wire and a box of twenty-four batteries. The manager noted that the purchaser was driving a gold Volvo, whose license number he recorded on the sales slip. A check of the car registration records revealed that the car belonged to one Irwin Seigel.[11]

Also present when Parola received the call from the Radio Shack was John McKeegan, a detective who had been assigned to the Arson and Explosion Squad (of which Parola was a member) since April, 1971. He told Parola that the car belonged to Sheldon Seigel, Irwin's brother, although registered in the latter's name.

McKeegan's familiarity with Seigel derived from an investigation he had conducted into a fire bombing of the Iraqi Mission to the United Nations which took place on March 2, 1971. McKeegan, at that time assigned to the 19th Detective Squad, had interviewed a doorman in a building across the street from the mission. The doorman was taken to the Department's Bureau of Special Investigation (BOSI) and shown a file of photographs. He singled out two as resembling the participants in the fire bombing. One, bearing the date "2/14/71", was of Seigel. (The picture had been taken during a street demonstration.) McKeegan thereupon commenced an investigation of Seigel, visited his home in Brooklyn, and learned that he drove a gold Volvo. The investigation ultimately terminated inconclusively; no arrests were ever made, and Seigel, apparently, never became aware that he was the subject of scrutiny.[12]

McKeegan was thus able to link Sheldon Seigel with the gold Volvo observed by the Radio Shack manager. He also provided Parola with the photograph of Seigel previously described which Parola showed, among several others, to the manager who picked out Seigel as being the "Feldman" who purchased the Micronta timers in April and the wire and batteries that day. The police immediately commenced surveillance of Seigel, which in turn led to his arrest on the following day.

I have concluded that the foregoing account demonstrates by far more than a preponderance of the evidence that the government's discovery of Seigel's identity was untainted by any information gleaned from the wiretap of the J.D.L. headquarters. Parola testified, furthermore, that he never received

clusively refutes it. Justice White, speaking for the Court, stated: "we are unconvinced that merely emphasizing the importance of the values served by exclusionary rules is itself sufficient demonstration that the Constitution also requires admissibility to be proved beyond reasonable doubt. . . . no substantial evidence has accumulated that federal rights have suffered from determining admissibility by a preponderance of the evidence." 404 U.S. at 488, 92 S.Ct. at 626.

10. The sales slips reflecting "Feldman's" purchase were received in evidence as Government's Exhibit 10, and Seigel admitted having purchased the timer under a false name.

11. Tr. 136–138 (Tr. refers to the hearing transcript.)

12. See transcript of hearing held April 16, 1973, pp. 3–16.

information concerning Seigel from wiretap sources or from the FBI.[13] I credit this testimony, and I find equally credible the entire account of the investigative process that led to Seigel's apprehension on June 4, 1971.[14]

Nor is there any substance to Seigel's contention that the government's knowledge of his role in the Hurok bombing derives from the wiretap of his home which commenced on or about December 15, 1971, and ended on March 1, 1972. (The purpose of this tap was to obtain information that would enable the government to forestall the planned bombing of the Russian Mission to the United Nations.)

Evidence adduced at the hearing established that no government official suspected Seigel's involvement in the Hurok bombing until he himself disclosed it to Parola on May 7, 1972.[15] A review of the logs of the wiretap on Seigel's home reveals nothing in these conversations even arguably connected to the Hurok bombing.

The conclusion I have reached regarding the utility of these taps was apparently shared by the government officials who reviewed them. John Martin Doggett, the FBI Agent whose function it was to review the logs on a daily basis, testified that he took no steps toward the investigation of the Hurok bombing as a result of reading the logs.[16] Doggett made no reports of these logs (which he deemed worthless) but did forward them to an Inspector Sullivan, Parola's superior in the Police Department. Sullivan also apparently thought them of little value. He presented no official report on them and did not communicate the information contained therein to anyone else in the Police

---

13. Tr. 61; 598–599.

14. The entire taint theory of the defense rests on a single conversation between Seigel and Parola, taped by Seigel in the fall of 1971. (Government's Exhibit 22, pp. 18–19):

"Parola: All right. If we wanted to prosecute the first case, don't you think we got a good chance of knockin' you over if we really push.
Seigel: Not much.
Parola: Supposing I decide to testify, and I bring Joe [Gibney] up to testify. You know about the shit that was bought in the [Radio Shack] store and how we came to get all this information. You know it's done on wiretaps.
Seigel: What's that have to do with the first case?
Parola: 'Cause that's how we stumbled on to you. What do ya think fingered ya? We did. We checked that store out agin, and we found out you bought those batteries, and we said that you're up to no fuckin' good. We said we better watch this kid cause their [sic] up to no fuckin' good, and we never had your name before. Said this is a fuckin' oddball name. We never had this kid before. That's how we stumbled onto ya. You know that. If you don't know it you're stupid or your fuckin' lawyer's dumb. Supposing me and Joey now turn around and say, O.K.; we told

Mel Glass, listen we're gonna testify for you Mel, I'll tell you exact–"

There is considerable uncertainty as to whether the final sentence of Parola's second set of remarks reads "You know it's *not* on wiretaps" or "You know it's *done* on wiretaps." After listening to this passage several times I reached the conclusion that the critical word was "done". (Tr. 1202.) I am inclined to agree with the government, however, that the context supports a reading of "not". Parola is throughout this passage tracing the steps leading to the government's discovery of Seigel. His remarks are indeed a less coherent version of his testimony at the hearing. The reference to wiretaps makes little sense if the crucial word is read as "done"; on the other hand, a reading of "not" suggests that Parola interjected an explanation of how Seigel was *not* discovered, and then proceeded with his account.

At the supplemental hearing held on April 16, 1973, Parola was confronted with this entire passage and insisted that he had said "not" (Tr. 36). I must attach some importance to this recollection. It carries even greater weight, in my view, because Parola consistently denied any knowledge or use of the J.D.L. wiretap in the face of persistent and, at times, unfairly confusing cross examination.

15. Tr. 46, 164.

16. Tr. 183.

Department.[17] Accordingly, Parola testified that he received no information regarding wiretaps either from Sullivan or from anyone in the FBI.[18] Nor did either of the two FBI agents investigating the Hurok bombing, Robert Nixon and Dennis DeBrandt, receive any information from these wiretaps.[19]

It is clear then that the government discovery of Seigel's participation in the Hurok bombing was due solely to Seigel's confession to Parola on May 7, 1972. No such information was derived from the wiretap of Seigel's home. Nor is this particularly surprising; neither Parola nor any of the other government officials had much reason to suspect Seigel, despite his acknowledged proficiency in the making of bombs. He had only recently betrayed the confidence of his J.D.L. associates in the Amtorg bombing, and was still in close contact with Parola. No one expected to find anything in the taps that would implicate Seigel in the Hurok case; nevertheless, even had government officials been more vigilant in scrutinizing these logs than they had reason to be, they could have discovered nothing useful in them. The government has thus demonstrated by a preponderance of the evidence that its information concerning Seigel derived from an independent source, and not from its wiretaps.

### I. B

Seigel next argues that the search of his car at the Meyers Brothers garage on June 4, 1971 was illegal. Because there were major discrepancies in the testimony of those involved in the search, I shall set out these divergent accounts. The government's version is based on the testimony of Detective Jeremiah Howard, and Seigel's upon his own testimony and that of Jacob Geha, a garage employee working there when the arrest took place.

17. Tr. 1219.

18. Tr. 598–599.

19. Tr. 40–42, 164.

20. Tr. 475–492.

Howard testified[20] that on the morning of June 4 he was assigned to relieve two detectives who were keeping Seigel's Brooklyn home under surveillance. He and his partner, Andrew Gutierrez, arrived around 10:00 A.M. and Seigel emerged at 11:30. They followed him to J.D.L. headquarters in Brooklyn and thence in a circuitous route in the area of Seigel's residence. Seigel was clearly aware that he was being followed from the outset and, in fact, took photographs of the policemen while he was at the J. D.L. headquarters.[21]

Seigel then drove into Manhattan, having meanwhile picked up Israel Danziger. They left the East River Drive at the 42nd Street exit and proceeded west on 42nd Street. The traffic was so heavy at that time that Seigel's car was forced to wait near 42nd and 3rd Avenue for two or three lights. During this waiting period Howard testified that he left his car and walked over to Seigel's. There he saw Danziger handling a "black powdery substance" as well as a shotgun shell. When he returned to his car Howard told his partner that he thought Danziger was making a bomb at that very moment.

They ultimately followed Seigel to the Meyers Brothers garage, where Seigel left his car on the first floor. Because, according to Howard, Seigel had left the car door open, he was able to see immediately a black plastic container with a red cap and a wick on the console between the two front bucket seats. A garage attendant, accompanied by Howard, took the car to the second floor, during which time Howard informed the attendant that he suspected there was a bomb in the car and instructed him not to permit any other cars on that floor.

During the interval of between one and two hours before Seigel and Danziger returned, Howard phoned the Arson and Bomb Squad, informed them of his

21. The film in the camera that was taken from Seigel after he was arrested was developed. There were two pictures of Gutierrez in front of J.D.L. headquarters in Brooklyn. (Tr. 490).

suspicions, and was told to use his best judgment. When Seigel and Danziger arrived they were arrested as they approached their car, by then returned to the first floor and parked diagonally facing a wall. Howard then searched the car and found a can of mace and a cylindrical bomb under the front seat; on the console he found a shotgun shell and the black film canister which he had spotted earlier. Howard did not personally search the trunk of the car in the garage, although he testified that the trunk was open after the arrest; in any event, the trunk was searched after the car was brought to the station house and the other items previously enumerated were discovered.

Seigel's account [22] differs in several important respects. He admitted that there were objects resembling bombs, of the type already described, in the car. However, he testified that he had manufactured them perhaps two weeks prior to June 4, that Danziger had no knowledge of them, and that they were at all times on June 4 in the trunk. Seigel did not flatly deny that Danziger was making a bomb at 3rd Avenue and 42nd Street, but did testify that he had no such recollection and that he would have remembered it had such a thing happened. He also denied leaving anything on the front seat or leaving the front door open. He also observed that upon his return to the garage his trunk lock had been twisted out of its normal position.

After carefully reviewing these conflicting accounts I am compelled to conclude that Seigel's is by far the more credible. First and most importantly, Seigel's version is completely corroborated by the testimony of Geha, the manager of the garage. Geha first saw the car after it had been moved from the first to the second floor, and after the attendants had been instructed not to permit other cars on that floor. After Geha located the car on the second floor, the interior was subjected to a thorough search by several policemen. Geha testified that all the police found was a can of mace under the front seat; he saw no bombs on either the front or the back seat. Furthermore, it was Geha who drove the car down to the first floor upon Seigel's return at a time when, according to Howard's account, the black plastic film container sat in plain view on the console. Geha testified that he saw no such container, and emphasized that if there had been anything resembling a bomb in the front seat he would never have entered the car.

Secondly, it is patently unbelievable that Seigel, who was well aware from the outset that he was being followed, would permit his companion to manufacture a bomb at the corner of 42nd Street and 3rd Avenue. It strains credulity even further that he would permit such activity to continue after Howard had left his car and walked over to Seigel's to get a closer look. As counsel quite aptly points out in his brief, "[t]he commission of a crime with a policeman at one's elbow is the classic case of legal insanity." [23] It similarly strains common sense to believe that Seigel left his car door open with a bomb plainly visible on the front seat. It is far more likely that the bombs which Seigel admits were in the car were secreted in the trunk, and that all that was present in the interior of the car was a can of mace.

██ Given these facts, it is abundantly clear that the warrantless search conducted of Seigel's car, both in the garage and later in the station house, was illegal. The general rule, of course, is that all warrantless searches, even when based on probable cause are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The search conducted here does not come within any of those exceptions.

---

22. Tr. 227–233, 320–364, 424–425.

23. At p. 89.

The first of these exceptions arguably applicable here is the "automobile exception", first established in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The Court there recognized that it is often not possible to secure a warrant to search a car because it can so readily be moved out of the locality. Hence courts have approved warrantless searches of automobiles where probable cause exists and where "the opportunity to search is fleeting." Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); United States v. Ellis, 461 F.2d 962 (2nd Cir. 1972); Cash v. Williams, 455 F.2d 1227 (6th Cir. 1972). It is debatable whether the opportunity to search the car in the garage was indeed fleeting: the *Chambers* and *Coolidge* cases have blurred that term significantly. It is not debatable, however, that Messrs. Howard and Gutierrez had no probable cause to conduct the search. If, as I find, Howard never saw any bombs being made by Danziger and saw nothing on the front seat after Seigel left the car, he had no reason to suspect that there were bombs in the car. His only suspicions could have arisen from the instructions given him by his superiors and the attendant explanation of the necessity of keeping Seigel under surveillance. Such suspicions are insufficient to constitute probable cause, and thus the search cannot be justified under the "automobile exception".

It follows that the later search of the trunk at the police station is also insupportable under this exception. Chambers v. Maroney, supra, held that where a car could legally have been searched when police first came upon it, a subsequent search at the station house was also permissible. Here we have the converse. Because probable cause was lacking in the search in the garage, the subsequent station house search is invalid as well.

Nor can the search be justified as one incident to a lawful arrest. The permissible scope of such searches was defined by the Supreme Court in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969): "There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'— construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." See also United States v. Mapp, 476 F.2d 67 (2d Cir., 1973). The application of *Chimel* to the automobile search was alluded to by the Supreme Court in a footnote in Coolidge v. New Hampshire, supra, 403 U.S. at 461, fn. 18, 91 S.Ct. at 2035: "Of course, if there is a criminal suspect close enough to the automobile so that he might get a weapon from it or destroy evidence within it, the police may make a search of appropriately limited scope." Here, Seigel and Danziger were immediately arrested, handcuffed and forced against a wall of the garage. In no sense could Seigel's car have been considered within the immediate control of either and it is difficult to imagine how objects inside a locked trunk could ever be within the immediate control of one arrested. Consequently any attempt to justify this search under a "search incident" theory also fails.[24]

For the reasons stated above, Seigel's motion to suppress the fruits of the search of his automobile is granted. The government will not be permitted to ask any questions of Seigel based on the contents of his automobile.

## 1. C

Seigel further argues he was promised that if he furnished the names of those involved in the Hurok bombing, he

---

24. Because I have concluded that the black plastic canister was not atop the console in the front seat of the car when Seigel left it, the search can obviously not be justified on any "plain view" theory.

would not be required to testify. He therefore demands that the court "enforce" this promise. Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L. Ed.2d 427 (1971); United States v. Carter, 454 F.2d 426 (4th Cir. 1972); United States v. Paiva, 294 F.2d 742 (D.D.C.1969). There is, however, nothing in this record that supports Seigel's contention, save Seigel's own testimony; to the contrary, there is much that undermines it.

Seigel testified that when Parola secured the return of his automobile in August, 1971, and when he first attempted to induce his cooperation, he promised Seigel that he would never be required to testify.[25] Shortly thereafter, when he confessed his participation in the Amtorg bombing, Parola allegedly repeated this assurance.[26] Seigel testified that he met Parola on numerous occasions in 1972, and, at least during those meetings in January, Parola again promised him that he would not have to testify.[27] Furthermore, although Pattison and Putzel, the Assistant U. S. Attorneys in charge of the Amtorg and Hurok cases respectively, clearly made no such promises to Seigel (as will appear more fully below), he contends that Parola undermined their remarks to him. Whenever either prosecutor would allude to the possible necessity for Seigel to testify, Parola would later assure him that as prosecutors they could not "tell you flat out you are not going to testify"[28] and would urge Seigel to disregard their remarks.

▮ Parola's testimony differed in some respects from Seigel's but was not altogether inconsistent. He stated that during the pendency of both the Amtorg and the Hurok indictments he never explicitly assured Seigel that his testimony would not be required; he said rather that he would try to "build a case around him,"[29] thereby obviating the necessity to use him. Any promise Parola might have made was expressly conditioned on the strength of the government's case and, in fact, was no real promise at all. I find that Seigel was never given unqualified assurance that he would not be required to testify.[30]

25. Tr. 249.

26. Tr. 250.

27. Tr. 267.

28. Tr. 253.

29. Tr. 575, 595–596, 617–618. At Tr. 617–618, for example, Parola testified as follows:

"Parola: Again, I guess I will have to repeat myself, that we discussed whether or not he would have to testify.

I said, you know, it will take time to build this case. You'll have to get out there, as well as me and the rest of the Police Department, and the FBI, and everybody concerned, to build this case around you. We have to build it around you in order to keep you from testifying, otherwise it will come down to where you'll go and I'll go together."

30. In his brief, Seigel places considerable reliance on the following conversation between himself and Parola, tape recorded on February 1, 1973, immediately before this hearing commenced:

"Parola: They're gonna throw me on the stand, they'll throw Joey [Gibney] on the stand and they asked me what I promised you and told 'em everything under the sun. I said we promised the kid the moon, the sun, the earth, I said we promised him money, we promised him immunity, we promised him everything. We told him the truth.
Seigel: Yeah.
Parola: We promised him everything under the sun. That, that's the only way we got him to talk to us. But we also promised him that you guys weren't gonna hurt him and this is just what I'm gonna say too if I have to."
(Government's Exhibit 24, p. 5)
A thorough reading of this entire conversation reveals that the above passage makes no reference to a promise that Seigel's testimony would not be required. The promises referred to are the promises of immunity made by both Putzel and Pattison which Parola believed (erroneously) were being reneged. Throughout the conversation (e. g. at pp. 9 and 10) Parola expresses concern that Seigel will be prosecuted and suggests that Putzel was lying when he promised Seigel immunity. There is not a single reference in this entire conversation to any promise by Parola that Seigel would not have to testify.

Even assuming that Parola's assurances were sufficiently ambiguous so that Siegel might have construed them as unequivocal commitments, he cannot reasonably contend that he was entitled to rely on them. For Seigel was never given any such assurance by either Pattison or Putzel; both prosecutors always told him that there was some possibility that he would have to testify. At the outset of Seigel's cooperation with the U. S. Attorney's office for the Eastern District of New York in the *Amtorg* case, he was told by Pattison that "the odds are 90 per cent we won't have to use you." [31] When Seigel met Putzel prior to his grand jury testimony in the instant case, he was told that there was only a "fifty-fifty chance" that his testimony would not be required.[32] Taken in context Putzel clearly was merely telling Seigel that he would not have to testify if the government were able to induce guilty pleas from the other defendants. In the absence of guilty pleas (the remaining 50% possibility) Seigel was to understand that his testimony would be required.

The defense conceded on the record [32a] that Seigel received no promises from anyone other than Parola. Indeed, nothing in Mr. Putzel's actions or statements could have been construed by Seigel as an assurance that his testimony would not be required. Consequently, Seigel had no right to rely on Parola's promises; he was doubtless aware that Parola's assurances contradicted those of Putzel and Pattison, and was similarly aware that these men, not Parola, were directing the prosecutions. The history of Seigel's conduct over the past two years reveals that he is anything but naive; his decisions were calculated and never precipitous. I furthermore refuse to believe that anyone cautious enough to record his conversations with government officials (a practice in which he has engaged since at least October,

1971) would be so rash as to rely on the assurances of one whom he knew could not effect those promises. Seigel should furthermore have been aware that Parola regarded the prosecutors with some suspicion and antagonism; the tapes of their conversations contain several invidious references to "the feds." [33] Hence Seigel had even less reason to believe that Parola's assurances could bind the federal government. Actually, having heard the witnesses, the court concludes that Seigel relied on nothing that was said to him by any law enforcement officer; that he was engaged upon a game of cat and mouse for his general amusement and in the long run, his own protection.

Nothing in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), contradicts the conclusion I have reached here. In *Giglio* the Supreme Court reversed and remanded for retrial a case in which the government had failed to disclose that its key witness (an unindicted co-conspirator) had been promised that he would not be prosecuted if he testified at the trial. Affidavits submitted after the trial revealed that one government prosecutor, albeit not the person who tried the case, had made such a promise. The Court there noted that "[t]he prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government."

*Giglio*, however, concerned an uncontradicted promise by a government prosecutor which other prosecutors in the same staff refused to acknowledge. Here, even assuming that Parola made the promises to Seigel that he contends were made (and I make no such finding), they were flatly contradicted by statements of government prosecutors. Moreover, the statements of a detective only peripherally involved in formulation

---

31. Tr. 253.

32. Tr. 401.

32a. Tr. 402.

33. Government's Exhibit 20, p. 9 [Transcript of October 27, 1971].

of prosecutorial policies cannot bind a prosecutor's office. Parola's statements cannot conceivably be attributed to the government when statements of authorized government officials contradict them.[34] In sum, Seigel had no right to rely on Parola's claimed promises, and his self serving claim of reliance is both unsupported by the record and belied by the caution and resourcefulness Seigel has displayed at every juncture of this case.

### 1. D

Seigel argues finally that the government deprived him of his right to counsel secured by the Sixth Amendment by communicating with him, from June 4, 1971 onward, in the absence of his lawyer. Seigel therefore contends that all evidence obtained in such conversations should be suppressed. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L. Ed.2d 246 (1964).

Shortly after he was arrested on June 4, Seigel engaged Harvey Michaelman as his attorney. Michaelman was one of a large group of attorneys who had volunteered their services to the Jewish Defense League.[35] However, at a meeting with Melvin Glass within two weeks of his arrest, Seigel was advised by Glass to seek "outside counsel" and avoid "J. D.L. lawyers." [36] Michaelman was not discharged but Seigel apparently followed this advice to the extent of not informing Michaelman of his meetings with government officials or of his subsequent decision to provide information on the Amtorg bombing. Later, in the fall of 1971, Seigel expressed to Pattison a desire to inform his lawyer of his cooperation, but Pattison advised against it.[37] In addition, Parola, by his own admission[38] repeatedly advised Seigel to tell Michaelman nothing, or at least to get a lawyer wholly independent of the J.D.L. Seigel thus contends that the government's continued efforts to steer him away from the effective aid of a lawyer deprived him of his Sixth Amendment rights; he further contends that Massiah requires the suppression of all evidence gleaned by the government from conversations with him in which he was not represented by counsel.

Seigel's reliance on Massiah is misplaced. In that case, the Court held that statements deliberately elicited by surreptitious means from a defendant already under indictment could not be admitted against him at the trial of that indictment. None of the devious methods practiced in Massiah were visited upon Seigel in the instant case. Unlike Massiah, Seigel was fully aware that he was making incriminating statements to government agents, and fully aware of what he stood to gain by doing so. The record here is barren of any coercion or deception practiced on him. Our Court of Appeals has emphasized (as have others) that Massiah is inapplicable in the absence of deliberate deception practiced by government agents. United States v. Barone, 467 F.2d 247 (2nd Cir. 1972); United States v. Garcia, 377 F.2d 321 (2nd Cir. 1967); United States v. Accardi, 342 F.2d 697 (2nd Cir. 1965); Hunt v. Nelson, 440 F.2d 58 (9th Cir. 1971); United States v. DeLoy, 421 F.

---

34. See Wilber National Bank v. United States, 294 U.S. 120, 55 S.Ct. 362, 79 L.Ed. 798 (1935): "Also, those dealing with an agent of the United States must be held to have had notice of the limitation of his authority."

35. Tr. 365–366. There is some dispute over the extent of Michaelman's ideological identification with the J.D.L. Seigel testified (Tr. 434) that when he first visited Michaelman, he indicated to Seigel that he had no interest in the J.D.L., and that he had simply responded to a request promulgated by the J.D.L. for legal assistance. On the other hand, Seigel acknowledged under cross examination (Tr. 451–452) that when the defendants were arraigned on the instant indictment, Michaelman, who represented him at that time, characterized the proceeding as an outrageous political prosecution.

36. Tr. 369.

37. Tr. 260–261.

38. Tr. 552, 563.

2d 900 (5th Cir. 1970) ; Davis v. Burke, 408 F.2d 779 (7th Cir. 1969).

Not only was Seigel not deceived, the record is clear that he was as eager as anyone to keep from his J.D.L. associates and even his lawyers any hint of his cooperation. Seigel repeatedly told Parola about his fear of others learning of his status; indeed, the reluctance to testify publicly that motivates the instant motion is merely the most prominent manifestation of this anxiety. Seigel admitted, under questioning by the court, that the decision not to consult Michaelman was not simply pressed upon him by Parola but was rather "a mutual kind of thing." [39] There is no evidence that the government coerced Seigel to avoid consulting a lawyer or endeavored with any persistence to keep him away from one. The government did not carefully monitor Seigel's comings and goings; had he wanted to consult a lawyer there was no one to stop him. The statements of Glass, Parola, and Pattison, cited earlier, which Seigel now invokes were no more than mild admonitions in which Seigel willingly acquiesced. Particularly damaging to Seigel's claim is his subsequent failure to inform Alan Dershowitz, whom he retained in the summer of 1972, of his informer status. Dershowitz has never been identified with the Jewish Defense League,[40] and Seigel could thus have entertained no apprehension that Dershowitz might have abused any trust placed in him. Yet Dershowitz did not learn of Seigel's cooperation until late October, 1972. The reluctance of Seigel to consult a lawyer, even one as uncommitted to the J.D.L. as Dershowitz, speaks volumes as to the sincerity of this claim.

One other critical aspect of Seigel's situation makes the invocation of Mas-
siah wholly misguided. Seigel, from the moment he indicated his willingness to cooperate in August, 1971, was never considered by the government as a true defendant. He was indicted in *Amtorg* and in the instant case only to conceal his involvement. Pattison, the Assistant U. S. Attorney in the Eastern District, gave Seigel a letter stating his intention to confer immunity upon Seigel,[41] and counsel for the government in the instant case has expressed a similar intention on the record here.[42] Thus the government has not prosecuted Seigel, nor does it intend to; he is purely and simply an informer—at the moment, one gone sour. For any court to hold that a government official must refrain from dealing with informers in the absence of counsel would be grotesque. Nothing in *Massiah* mandates such a conclusion, and its implications for the conduct of government investigations would be disastrous. Informers are, unhappily, a necessary part of innumerable prosecutions.[43] Cf. United States v. DeSapio, 435 F.2d 272 (2nd Cir. 1970). I cannot conclude that the government's dealings with such people must be hampered by the strictures of *Massiah*.

## II.

Defendants Cohen and Davis have moved to dismiss the indictment or, alternatively, to suppress all testimony of Seigel on the ground that the presence of Seigel, a government informer, in their midst, violated their right to counsel secured by the Sixth Amendment. This motion is denied.

The testimony adduced at the hearing establishes that while Seigel was present at several meetings of the defense team, he never disclosed any aspect of the defense tactics to any government official.

39. Tr. 380.

40. See Seigel's Brief, p. 16, fn 19 : "Alan Dershowitz has publically (sic) attacked the J.D.L. on many occasions, has never previously represented any members of the J.D.L., and has represented many clients of extremely opposite political persuasions."

41. Tr. 252–254. The Pattison letter is Defendant Seigel's Exhibit A.

42. Tr. 324.

43. It is conceded here, for example, that the information Seigel provided here helped save lives and prevent considerable property damage. (Seigel's Brief, p. 130).

Henry Putzel, the Assistant United States Attorney in charge of this case, instructed Seigel when he first met him on June 16, 1972 (immediately prior to Seigel's grand jury testimony) that he was not to disclose to him or any other government official anything concerning defense strategy.[44] It appears that Seigel obeyed and, in fact, Seigel did not meet with any member of the United States Attorney's office for the Southern District of New York until mid-January, 1973. In the interval, the government prosecutors communicated with Seigel through his lawyer, Alan Dershowitz, who was described as having "scrupulously avoided" divulging anything remotely suggestive of defense strategy.[45] Nor is there any evidence that the government received any information from Seigel through Parola. It appears that Parola met Seigel less frequently after the return of the instant indictment; from that point onward he seems to have regarded Seigel as more properly the concern of federal rather than state authorities. Parola testified that he saw Seigel no more than five or six times in the ensuing six months [46] and that Seigel mentioned nothing to him about his meetings with other defendants or their lawyers. Parola was not even certain that he knew the name of Seigel's own lawyer.[47] Nor do any of the tape recordings of conversations between Seigel and Parola reveal any discussion of defense strategy.[48]

The only indication of any such disclosures was Detective Gibney's testimony that Seigel said the defense team in the Amtorg case suspected the existence of an informer.[49] Although there is serious question whether the suspicion of an informer can reasonably be considered a part of defense strategy, it was, in any case, expressed to this court by several defense lawyers during motion hearings on September 8, 1972.

Messrs. Zweibon and Slotnick, attorneys for Davis and Cohen respectively, testified that Seigel attended several conferences of defendants and their lawyers in June and July. After July 31, 1972 there is no evidence that Seigel attended any so-called defense strategy sessions. He was present, however, at a meeting during the fall of 1972 at J.D.L. headquarters at which Zweibon apprised all of the defendants in the *Hurok* and *Amtorg* cases of their progress. Zweibon also met Seigel informally at a restaurant on several occasions, and testified that on one occasion he elaborated his theory of the case in considerable detail.[50] Zweibon also testified that as soon as Dershowitz learned of Seigel's true status, in October, 1972, he terminated his attendance at meetings with other defense counsel.

 The evidence thus establishes with abundant clarity that although Seigel continued to attend some defense meetings in order to conceal his true status, he never disclosed anything that was discussed at these meetings to the government. Not only were his meetings with government prosecutors infrequent, but they all were well aware of possible Sixth Amendment problems and instructed him to make no disclosures.

Nor is Seigel's pattern of behavior at all surprising. The one indisputable fact that emerges from these hearings is that Seigel's allegiances are not easy to

44. Tr. 821–822.

45. Tr. 797–798.

46. Tr. 877–878.

47. Tr. 842.

48. In addition, Thomas Pattison, the Assistant U. S. Attorney for the Eastern District of New York in charge of the *Amtorg* prosecution testified that he met Seigel at perhaps monthly intervals from the time of the *Hurok* indictment onward. At no time was there any discussion of the *Hurok* defense strategy.

49. Tr. 909–910.

50. Tr. 1031.

identify, nor are his motives easy to fathom. He seems to have felt, at one time or another and sometimes at the same time, allegiance both to the government and the Jewish Defense League. Although each side now has reason to regret his activities, each must concede that he steadfastly avoided revealing the secrets of one to the other. If one can accept Seigel's simultaneous cooperation with the government in *Amtorg* and his admitted participation in the *Hurok* bombing, one can just as readily comprehend his attendance at defense strategy sessions and refusal to disclose this strategy to the government.

Unable to demonstrate any actual disclosures of their stategy by Seigel, Cohen and Davis are thus reduced to arguing that any intrusion by the government into the defense preparation *ipso facto* taints the entire prosecution. In essence they ask this court to follow Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749 (1951) cert. denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952) and Caldwell v. United States, 92 U.S.App.D.C. 355, 205 F.2d 879 (1953). Although the *Coplon* and *Caldwell* cases were cited with apparent approval in Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the Court's observations there were dicta, and the *per se* rule which those cases establish has not been followed in other circuits. Compare United States v. Zarzour, 432 F.2d 1 (5th Cir. 1970) with United States v. Rispo, 460 F.2d 965 (3rd Cir. 1972).

Our Court of Appeals has now however, rejected precisely the *per se* rule for which Seigel argues. In United States v. Mosca, 475 F.2d 1052 (2d Cir., 1973), a defendant continued to participate in conferences with his co-defendants after he had begun to cooperate with the government. There, as here, the government denied receiving any information from him regarding defense strategy. On appeal, the *Coplon* and *Caldwell* cases were invoked and the court responded as follows:

> "Thus, while we believe that such tactics are beneath the high standards of professional conduct expected of government counsel, we do not find such tactics to be so condemnable as to warrant automatic reversal. *Prejudice to appellants must be considered.* Finding none, we hold that no substantial right of appellants has been infringed." (Italics supplied.)

Although *Mosca* undermines most of Cohen and Davis' argument, it does afford them some assistance. During the trial of the case Judge Dooling directed Scially, the government informer, to limit his testimony to events which occurred prior to the filing of the indictment.[51] Should such a problem arise in the instant case the court will be mindful of that ruling.

Except as noted in the preceding paragraph, the motion of Cohen and Davis is denied. *Mosca* requires a showing of prejudice, and they have demonstrated none.

## CONCLUSION

To summarize, Seigel's motions to prevent the government from calling him as a witness is denied except that the government may not question him regarding the June 4, 1971 search of his car. The motion of Cohen and Davis to dismiss the indictment is also denied.

It is so ordered.

51. 475 F.2d 1052, at 1061, fn. 20.